This is Interface, Inc. v. Tandus Centiva, docket number 15-1475. Attorney DeKalb, did I pronounce that correctly? Yes, Your Honor. Candice DeKalb. Okay. You're reserving five minutes of your 15 for rebuttal, is that correct? Yes. Okay.  Good morning, Your Honors. May it please the Court. I'd like to address issues that warrant finding patentability of Interface's claims, 20-24 of the 473 patent and 1-4 of the 282 patent. First, the Board's erroneous construction of the sufficient sheer strength limitation to encompass resistance to vertical movement. And second, the Board's erroneous conclusion of obviousness over the combination of Kinoshita and Passione. So first, the claim construction. The claims require an adhesive layer with sufficient sheer strength so that the connector will prevent adjacent tiles from moving relative to the connector or each other, thereby creating gaps between the adjacent tiles after installation. As the Board acknowledged, there's a plain and ordinary meaning for sheer. It's a force that acts in a direction parallel to the plane of contact between two surfaces. And the claim specifies that we're talking about the sheer strength of an adhesive layer as it is installed. It's spanning the seam between adjacent carpet tiles. It's adhered to the carpet tile backing. It's flat on the floor. The plane of contact between the adhesive layer and the tile backing is horizontal. It appears to me that the patent here, the invention, is reflected in the prior art of Kinoshita. It's almost identical. What differences are you arguing? Well, Kinoshita discloses only pieces of adhesive tape. Kinoshita describes three ways to tape carpet tiles together. It's adhesive tape, just like the patent specification distinguished as an unsuccessful attempt to solve the problem faced by the inventors. The tape of Kinoshita does not have the sufficient sheer strength limitation. Well, I'll start. I'll back up a step. The board recognized that Kinoshita does not disclose all of the characteristics of the invention. The board recognized Kinoshita doesn't have the sufficient stiffness limitation. It reached out to Passione for that, a reference that doesn't have anything to do with taping carpet tiles together, but discloses a continuous anchor sheet subfloor. These rigid, thick, abutting anchor sheets with fabric pieces stuck onto the top by a hook and loop system. In looking at Kinoshita, the board also acknowledged that Kinoshita is silent. It doesn't tell you anything about the characteristics of the tape pieces. The board inferred the sufficient sheer strength limitation, and that finding is not supported by substantial evidence. The board relied first on what it characterized as its common sense conclusion, that when Kinoshita talks about the fact that the taped-together carpet tiles won't rise up and peel off under a vacuum, it's actually disclosing resistance to lateral sheer force. The board said anyone would know that when you run a vacuum over a carpeted surface, you're generating not only vertical suction, but also lateral sheer. There's not a shred of evidence in the record to support that the relevant person of ordinary skill in 2004 would have believed that the rising up and peeling off language of Kinoshita disclosed the sufficient sheer strength limitation. And it was improper for the board to substitute its conjecture about the force vectors created by vacuuming for evidence about the understanding of a person of ordinary skill. I guess are you disputing it? Are you disputing that when you're vacuuming your carpet, there aren't some horizontal forces that are being applied as the vacuum cleaner is crossing over all the carpet tiles? Well, Your Honor, there wasn't a chance to build a record on this below because the first time this came up was in the final written decision, but yes. You are disputing it. It's purely vertical forces that are occurring during the vacuuming act. There are multiple forces created during the vacuuming act, and they all have a vertical component. Okay. They have a vertical component, but when you say they have a vertical component, that suggests that they have other components as well, which are not vertical. That is that they have at least some vector of lateralness to it. Well, and again, there wasn't a record built on this below. The sufficient sheer strength limitation of the invention relates to a purely lateral sheer force. And the one thing that is common sense about vacuuming... at the same time, you would still agree that it has sheer strength, right? I mean, sheer strength doesn't mean it can only have resistance to lateral pressures. Something that has sufficient sheer strength may also have, for example, sufficient bond strength to resist being torn apart in a different direction. But sufficient sheer strength specifically relates to resistance to forces in this lateral plane. But wouldn't a person skilled in the art look at that and say, gee, all I need to do here is to select an adhesive that will keep the tile in place during vacuuming? With knowledge of Interface's invention, perhaps. But the evidence is that a person of ordinary skill in the art at the time of the invention knew one thing about adhesive tape, and that's that it would not work. Everything about the art taught against using adhesive tape. There was a long accepted understanding in the industry that adhesive tape would not work to hold adjacent carpet tiles together against lateral gapping. That's what your inventor says in the specification, right? And then the inventor found some off-the-shelf adhesives, the 3M cells, and identified those as having sufficient sheer strength so that the carpet tiles would be able to be fitted together for their intended use, to have a contiguous carpet that doesn't fall apart. I believe your Honor is referring to the declaration submitted by inventor Keith Gray in the IPR proceedings. And the specification of the patent. Well, the specification of the patent distinguishes adhesive tape because it's an unsuccessful prior art attempt to solve the problem that the connectors solved. Mr. Gray in the IPR proceedings testified that after he had worked on a project for glueless installation, after he had discussed this idea of using adhesive but not using it to glue the tiles to the floor, and after he had arrived at the idea of a connector that would connect carpet tiles and withstand lateral movement without gluing them to the floor, then he went to a third party, he went then to a fabricator, and it took the fabricator 14 to 30 days to come up with a prototype that was subjected to further testing in-house and in the field. So it wasn't as simple as going to an adhesive tape manufacturer and saying, give me the one that works for carpet tile installation. Identifying, you know, the evidence is, in fact, there was no tape in the art that was ever developed, designed, or successfully used for carpet tile installation. And Tandis's tape expert told us that identifying a tape that would be suitable for a particular purpose like resisting lateral gapping between adjacent carpet tiles would involve a multitude of choices. First, to identify the core functions the tape must perform, and then he said there are thousands of choices that would need to be made to identify the right film, the right adhesive, the right combination of film and adhesive to test those combinations to see if they would fulfill the core functions. Right. I guess, you know, you're telling us that all the evidence points in the direction that nobody knew how to find the right kind of adhesive, and at a minimum we have Kinoshita and Passione that suggest alternatives of just using adhesive to stick the, you know, what we'll call the connector to the bottom of the carpet tiles. And so isn't there an inference there that at least from those two people's perspectives, you know, one of skill in the art would be able to find the right kind of adhesive to make the carpet tiles work for their intended purpose? Well, at least two things. First, you know, the evidence of what actually happened in the real world works against that. Kinoshita came out in 1991, and until Interface came up with its inventive connectors, no one was using connectors with an adhesive layer to install carpet tiles. No one was even using adhesive tape. After Interface came out with its connectors, almost all of its competitors rushed to market with their own connectors. Tandis is actually one of them. Tandis applied to patent its version of the connectors. It described its connectors as including the same characteristics and serving the same function as Interface's connectors, and it relied on results of testing Interface's connectors in its patent application. That was powerful evidence of non-obviousness that the board completely ignored. Just curious, do you have any patent claims anywhere in the portfolio that recite the specific attributes of the ideal adhesive that works? Because right now, this particular claim, when it says sufficient shear strength so that the carpet doesn't fall apart, to me that's—it feels a little result-oriented. It's saying, use an adhesive that works. Any adhesive that works, we're claiming it. That's how I read this claim. Now, do you have other claims somewhere that's identifying more specifically the kinds of physical attributes of the adhesive that kind of more concretely tie down what kinds of adhesive are the magic adhesive? With respect to the sufficient shear strength of the adhesive, the claim simply identifies that core requirement. The specification of the patent provides a great deal of information about specific attributes of the adhesive and provides specific examples— What are those attributes in the specification? Does it actually provide attributes, or does it say that the adhesive must be strong enough? The specification gives three specific examples of adhesives that will have sufficient shear strength and be compatible with specific backings. But in terms of defining the shear strength, it does define the shear strength in terms of what it is sufficient to resist. In a sense, it's functional claiming, but that's all right, as long as the function isn't inherent in the prior art. And I'd submit the function isn't inherent in the prior art. Kinoshita just discloses pieces of adhesive tape. One could look at Kinoshita and speculate that those pieces of adhesive tape may have had sufficient shear strength to resist lateral movement of carpet tiles away from each other after they're installed, but there's nothing in Kinoshita that dictates that it's necessarily so. Okay, you're in your rebuttal time. My apologies, Your Honor. It's okay. And thank you.  Your Honors, good morning. May it please the Court. Substantial evidence controls almost all of the issues here, and the Board did a very thorough job of reviewing the record and reviewing the expert testimony on both sides to come to what we believe is a very well-reasoned and substantially supported decision. There are only two supposed key limitations to the claims that Mr. Kerr just talked about. It's the shear strength limitation and sufficiently stiff. And the shear strength limitation, the only mention in the patent about what that means, is that it is sufficient shear strength to prevent the tiles from moving relative to the connectors or each other, and thereby creating gaps between adjacent tiles after installation. That's Column 7, Lines 6 through 9. There's nothing else in the record. If you look at Kinoshita, and Ms. DeKerr pointed to Dr. Jensen and said that there was a multitude of possibilities, Dr. Jensen was a Ph.D. tape engineer from 3M who Interface chose not to even cross-examine on any of his opinions with respect to the prior art. So when he said that when he sees Kinoshita, it discloses sufficient shear strength, they didn't even cross-examine him on that point. The fact that Interface says over and over that adhesive tape didn't work, that is belied by the evidence. It's very clear, and both Anderson, Bradford, and Wood, three of the experts retained by Interface, they all said they were talking about duct tape, something you could buy from the hardware store and put for a temporary installation. The record shows, however, that the adhesive tape of Kinoshita, where it talks about having double-sided adhesive tape and having different power, Kinoshita recognized that, or it discloses an adhesive tape that has more properties than the duct tape that you could buy from a hardware store. And you can tell that, Your Honors, by the fact that Kinoshita talks about linking the tiles together and being able to, the carpet tiles could be raised up and stay linked. If you're going to stay linked, you're going to stay together in the horizontal direction. In addition to the vertical direction, like Judge Chen pointed out with the vacuuming, vacuuming is going to prevent both vertical and horizontal movement. So the sufficient shear strength is clearly taught by Kinoshita, even if Interface's claim construction is adopted. Also, you know, Interface talks about the process here, and they made a very big deal about saying that this was a long and arduous process and that Keith Gray, who was identified by one of the Interface inventors as the key inventor here, what he did was he called up a tape manufacturer and received immediately an off-the-shelf adhesive that worked, that was used for automotive decals. So if you come up with this idea of let's use adhesive tape without recognizing that Kinoshita already solved the problem that Interface says their invention solved, and he calls up an adhesive tape manufacturer and voila, he has the tape that he needs for the invention. That's not an invention. There's nothing there. There's nothing patentable. In addition, I mentioned what is said in the specification about sufficient shear strength. You'll note that there's no values. There's no data. There's no examples of what the sufficient shear strength would be. It's exactly what we say is that it's a carpet tile that works. It's a connector that keeps the carpet tiles together. They point to the definition of gap as kind of the basis for saying that gap means that it refers only to horizontal movement. This was proven to be incorrect. First of all, there are dictionary definitions that the board wrote that said gap just means an opening or space. It's not limited to being lateral. Testimony from one of the inventors, Keith Gray, said that that is not a term of art. And then there are experts. In fact, Benny Wood was one of their experts, and he was involved in writing the standard for carpet tile installation, and he said it's called the ANSI standard. And he said, well, that defines gap as only referring to lateral movement. And we didn't have that ANSI standard because it wasn't in his expert report, his declaration. So during the two hours in between, we got the ANSI standard. And lo and behold, it doesn't define gap as only referring to lateral movement. So then he backtracked and said, well, they must have gotten it wrong, and that he was going to call them afterwards and tell them that they got it wrong. And then the same ANSI standard that he was relying on says that dimensional stability is still a problem. Dimensional stability refers to the ability of a carpet tile to lay flat. So the ANSI standard that Mr. Wood relied on actually says that gaps can cause from a lack of dimensional stability, meaning that it can be caused by vertical movement. I think it's also important to note, Your Honors, that even if the claim construction, if you agree with Interface that the claim construction only is restricted to lateral movement, which we believe is not the case, Kedeshita and Pachione still disclose that limitation. As this court is well aware, this is a substantial evidence standard. The claim construction has significant expert and other testimony with it, so that it is a deferential standard under TEVA. The obviousness findings, while they can be reviewed de novo, there's a lot of testimony, a lot of expert opinions, that the board really did a good job of going through and finding that the claims were obvious. We also noted, although Ms. DeKerr did not bring them up on her opening, that there are a lot of new arguments that were raised, primarily with respect to the Pachione reference. And these were brought up on the first time on appeal, and so they've been waived. I assume Ms. DeKerr is going to discuss secondary considerations in her rebuttal time, and I just wanted to note for the record that the board did a very thorough job of going through each of the secondary considerations that Interface relies on, and they said for each one there is no nexus. For instance, with respect to long-felt need, the board correctly found that Kedeshita and Pachione already did it. They already had the glueless installation method, so the problem had already been solved. With respect to skepticism, the board found that there was no experts that had any, or those of ordinary skill in the art that were skeptical of this invention. It was merely some customers that were approached. With respect to commercial success, again, they don't show that any of the commercial success was related to the merits of the claimed invention. There were lots of reasons identified in the record for the increased sales, including that the Interface connectors were less expensive. There was a return policy, recycling and reduced waste. None of these are in the patents, and there's evidence that there was a very aggressive marketing campaign with respect to the Interface connectors, the tactiles that established those were the reasons why the sales were successful, if they were at all. There's also no evidence about what the market share and what that actually meant with respect to other sales or other methods of connecting carpet tiles. As you well know, no one is actually buying connectors. They're buying carpet tiles. That's what drives sales, and the connectors go along with it. The last evidence of secondary considerations is copying. The district court found that there was a preliminary injunction filed against Tandis, and the district court found that there was a substantial question with respect to infringement with respect to the sufficiently stiff limitation. Also, Tandis is a competing product. They tout it as a superior product that's used for high moisture applications. It's a different size. It's a different color. It's different. And there's no evidence in the record that there was actual copying done. So I have some time left. I'm happy to answer any questions. Okay, thank you very much. Your Honors, I try to be concise and I jump around a little bit, starting with Kinoshita. We did cross-examine Tandis' carpet tile installation expert, and he admitted at deposition that Kinoshita does not disclose core requirements, core requirements for an adhesive tape that would work to prevent lateral gapping between carpet tiles. And Kinoshita says absolutely nothing about the characteristics of its single-sided tape, except that carpet tiles taped together with it won't rise up and peel off under a vacuum. The suggestion is that given Kinoshita and Passione, which I hope to turn to in a moment, it would have been simple for a person of ordinary skill just to go and say, I need an adhesive tape that will work. But history proves this was not so. It didn't happen. It's been a long time since Kinoshita. No one tried it. Even the Board's decision combines two different arts, carpet tile installation and adhesive tape, to support its obviousness analysis. I'd like to get back to Passione, because you mentioned Passione earlier, Your Honor, and appeared to understand that it taught adhesive. Passione does not teach adhesive-bearing sheets. Passione has this anchor sheet system, a continuous underlying rigid anchor sheet with decorative fabric covering fastened to the top with hook-and-loop attachment. It makes three passing references to substituting adhesive for the hook-and-loop. Two of those references doesn't say where to put the adhesive. The third reference, it says put the adhesive on the underside of the carpet. It doesn't provide any of the additional information that the experts, including Tandis' Dr. Tippett, say would be necessary to convert a hook-and-loop system to an adhesive system, given that they are such very different structures. Moreover, What part would be entailed? It strikes me as a matter of just common sense that it wouldn't be all that difficult to substitute glue for Velcro. The experts say it's not so, and I would refer Your Honor to A3626-27, A4009, I'm sorry, give me that number again, please. I'm sorry, A3626-27, A4009, A4295, and A4124. All right, and these are your experts' declarations and testimony? It's our experts' and Tandis' experts'. And the gist of it is that if you have Velcro, it's just really difficult to go from that to an adhesive system? Certainly that more information is required than saying simply substitute adhesive, that additional structural modifications would be necessary to make the attachment system work. I'm hard-pressed to imagine what they would be. Can you give me a little bit of an idea as to what would be required? Well, a hook-and-loop is a two-sided system, right? And you've got a mechanical attachment of the hooks and loops. The adhesive, particularly the adhesive of the invention, it's on one side of the connector. It needs to be releasable, but still necessary to have sufficient shear strength to resist lateral movement. It's just an entirely different kind of system. Okay, all right. To go back to Passione, Passione is not concerned with using an adhesive-bearing film to prevent relative lateral movement of those fabric pieces that are fastened to the top. It's concerned with providing this whole structure, an assemblage that's a continuous anchor sheet, a fabric covering, and it's focused on the stability and mass of that entire structure, preventing it from sliding over the floor. And I see that I'm out of time. You can have a concluding thought. All right. I would urge your honors to look at the secondary considerations of non-obviousness. The board gave them passing treatment. They are of significant weight. They are the real-world evidence that shows how the marketplace actually received this invention, and they prove its value. Okay, thank you very much.